[Civ. No. 25499.  First Dist., Div. Three.  Jan. 13, 1970.]

In re TRINITY TRACTOR CO. in Voluntary Dissolution.
TRINITY TRACTOR CO., Plaintiff and Respondent, v.
ALLIS-CHALMERS MANUFACTURING COMPANY et al.,
Defendants and Appellants.

### Counsel

Thomas M. Montgomery and Raymond W. Schneider, County Counsel, William J. Losh, Jr., Acting County Counsel, John D. Cook, Johnson & Stanton, Gardiner Johnson, Thomas E. Stanton, Jr., Marshall A. Staunton, Dinkelspiel & Dinkelspiel, John F. Taylor, Gary J. Shapiro and Joseph J. Brecher for Defendants and Appellants.

Park, McNeil, Swaner & Leslie and Alvin D. McNeil for Plaintiff and Respondent.

### Opinion

**CALDECOTT, J.**—This case involves appeals by Allis-Chalmers Manufacturing Co. (hereafter referred to as A-C), C.I.T. Corporation (hereafter CIT) and Humboldt County (hereafter Humboldt) from an order of the Superior Court of Humboldt County entered on November 21, 1967.

Trinity Tractor Co. (hereafter Trinity) is in the process of winding up and dissolution under court supervision, pursuant to Corporations Code section 4600 et seq. In the proceedings below, Trinity filed, on January 11, 1966, its "Petition for Approval of Preliminary Accounting, Approval of Board of Directors' Action in Approving Creditors' Claims; Instructions With Respect to a Secured Claim, A Disputed Claim and Administrative Claims; and Approval of Interim Fees and Compensation." CIT filed its "Objections to Preliminary Accounting" and to the claims of A-C and Humboldt County. Hearing was had following which a memorandum decision was filed. The court then made and entered its order. These appeals followed.

Trinity was a licensed dealer in A-C's new and used construction machinery, parts and related equipment. On June 24, 1963, the shareholders of Trinity executed a written consent to voluntary winding up, pursuant to Corporations Code section 4600 et seq.

Trinity filed its petition with the superior court on August 31, 1964 for supervision of the dissolution proceedings, pursuant to Corporations Code section 4607. The court accepted jurisdiction on September 14, 1964. The court ordered all creditors to present their claims and stated that if they failed to present the claims within the time limit, they would be barred.

Pursuant to this order A-C filed its claim as a seller under a conditional sales contract in the amount of over $130,000. CIT objected to A-C's claim as a secured creditor.

After filing its claim A-C, without application to or authorization by

the court, repossessed the parts inventory of Trinity. Trinity had an equity of $14,506.06 in these parts. A-C resold these parts and kept the proceeds, crediting Trinity with the equity. A-C also repossessed the new equipment inventory of Trinity under the conditional sales contracts. A-C auctioned this equipment, realizing $71,925 of the aggregate contract price of $92,053. A-C also retained these proceeds.

During the period of court supervision Trinity sold from its used equipment inventory various pieces of equipment against which A-C claimed enforceable conditional sales contracts. The amount realized from these sales, $15,200, was turned over to A-C. These proceeds were also kept by A-C. In addition, the proceeds in the amount of $2,496 from certain leased equipment were paid directly to A-C. Thus, A-C received a total of $17,696 from Trinity as proceeds from the distribution by Trinity of used machinery inventory during the period of court supervision. In consideration, A-C cancelled a portion of the indebtedness then due it from Trinity.

In May of 1965, during the period of administration, the balance of the equipment inventory of Trinity was sold at public auction. From this sale proceeds amounting to $33,987.77 were realized. A-C claimed it was a secured creditor and entitled to priority as to $28,200.38 of the auction proceeds. This claim was based upon conditional sales contracts covering the auctioned machinery.

The court issued an order denying A-C any rights, under its conditional sales contracts, to the proceeds from the sale of used equipment and ordered A-C to return the proceeds from the sale of the new equipment repossessed by A-C, plus Trinity's equity in the parts repossessed and also the amount of the payments A-C received from Trinity.

Humboldt County also filed a claim and asserted priority for personal property taxes and penalties. Humboldt claimed personal property taxes and penalties for the following years and amounts:

| Year | Tax | Penalty to 8/31/64 | Penalty after 8/31/64 | Total |
|---|---|---|---|---|
| 1962 | $ 2,320.00 | $ 286.42 | $ 1,056.10 | $ 3,662.52 |
| 1963 | 4,596.75 | 367.74 | 1,355.82 | 6,320.31 |
| 1964 | 3,905.25 | –0– | 1,386.01 | 5,291.26 |
| 1965 | 1,513.40 | –0– | 423.67 | 1,937.07 |
| Total | $12,335.40 | $ 654.16 | $ 4,221.60 | $17,211.16 |

Humboldt, with respect to these claims, filed certificates of delinquent personal property taxes pursuant to section 2191.3 et seq. of the Revenue and Taxation Code, as follows:

| Year | Date Certificate Filed |
|------|------------------------|
| 1962 | November 13, 1962 |
| 1963 | January 16, 1964 |
| 1964 | November 25, 1964 |
| 1965 | December 23, 1965 |

Humboldt was granted a priority as to a portion of its claim and denied a priority as to the rest of its claim.

CIT claimed that it was entitled to attorney fees for presenting and prosecuting its objections to A-C's claim and Humboldt's claim because the result was to increase the fund for all unsecured creditors. The court denied this claim.

A-C, Humboldt and CIT have each appealed.

## I

### *The Appeal of Allis-Chalmers*

A. Did the trial court exceed its jurisdiction by entertaining and accepting the objections of CIT to A-C's claim under the conditional sales contracts and dealer's agreement?

Pursuant to the order of the superior court assuming jurisdiction over the dissolution and winding up of Trinity Tractor, A-C filed a claim as a secured creditor. CIT objected to the A-C claim (as well as to the claim of the County of Humboldt).

A-C contends that the jurisdiction of the trial court extended only to determining whether or not there were valid conditional sales contracts between Trinity and A-C to set off debts due Trinity under the dealer's agreement. It is A-C's position that the trial court exceeded its jurisdiction by entertaining and accepting the objections of CIT to A-C's claim under the conditional sales contract and dealer's agreement. A-C claims that the jurisdiction of the superior court to supervise the voluntary winding up of a corporation is limited, by Corporations Code section 4608, to making a determination that a valid debt exists or does not exist against the corporation and if it does exist whether or not it has been properly substantiated. In other words, A-C's position is that the trial court did not have the authority to decide whether A-C was a secured creditor, and thus entitled to claim a priority.

Logic and the language of Corporations Code section 4608 compels a contrary conclusion. Section 4608 confers on the court authority to require "the presentation and proof of all claims and demands against the corporation, whether due or not yet due, contingent, unliquidated, or

sounding only in damages. . . ." Further, Corporations Code section 4607 gives the court authority to "make orders and adjudge as to any and all matters concerning the winding up of the affairs of the corporation." The court would be unable to perform this function if it could not determine the validity of a claim and its relationship or priority as to other claims. The cases cited by A-C, *Barber* v. *Irving,* 226 Cal.App.2d 560 [38 Cal. Rptr. 142], and *In re Mayellan Apartments, Inc.,* 134 Cal.App.2d 298, 302 [285 P.2d 943], are of no help to the appellant and do not support its position.

Thus the trial court had jurisdiction, and did not err in entertaining CIT's objections to A-C's claim of priority.

B. Are the unrecorded conditional sales contracts, between A-C and Trinity, for new and used machinery valid and enforceable as against a third party creditor, CIT?

Trinity Tractor was a licensed dealer in A-C new and used construction machinery, parts and related equipment pursuant to a written dealer's agreement. Paragraph 5 of the dealer's agreement gives A-C the "right of repossession upon any default" and the title "is reserved and retained by the Company until the Dealer has made full payment in cash. . . ."

Trinity would purchase new equipment from A-C by the use of a conditional sales contract with Trinity as buyer and A-C as seller. Under the conditional sales contracts for new machinery A-C retained title to the machinery sold, with right of recourse, the right to repossess the equipment in the event of a default and the right to the proceeds from a sale after a default.

Used equipment was financed by Trinity selling new or used equipment to a customer and used equipment would be traded in. Trinity took the used equipment into its possession. Simultaneously, with assuming possession Trinity gave a bill of sale to A-C and in consideration A-C gave Trinity credit on the equipment sold. Contemporaneously with this transaction A-C would sell the traded-in equipment to Trinity Tractor under a conditional sales contract by which A-C would retain title.

The conditional sales contracts for used machinery contained the same provisions as the contracts for new machinery with respect to retention of title, with right of recourse, the right to repossess the equipment in the event of a default and the right to the proceeds from a sale after a default.

Paragraph 30 of the dealer's agreement provides that upon termination of the agreement, A-C shall have the right "(1) to apply any indebtedness of the Dealer to the Company against any indebtedness of the Company to the Dealer arising out of the purchase by the Company of machinery or

parts as hereinabove provided, and (2) to apply any deposits and sums due or to become due to the Dealer against any sums or accounts due or to become due from the Dealer to the Company. . . ."

New and used machinery was sold and financed by Trinity and A-C in the above manner. Parts were also sold. These parts were financed through a warehouse financing arrangement.

Prior to these sales, Trinity entered into an agreement dated April 23, 1959 with CIT under which CIT would finance Trinity's sales of the various equipment. Contracts between Trinity and its customers were sold to CIT with recourse. CIT's claim as a creditor arises after the default of seven purchasers under conditional sales contracts. Trinity repossessed the equipment and could not sell it. CIT removed the equipment from A-C's yard and took it to Oregon where it was sold. As a result of these transactions CIT filed a claim for $77,538.52 as representing the amount of Trinity's deficiency, plus the costs of repossession and sale of the equipment.

Trinity filed its petition with the superior court on August 31, 1964 for supervision of the dissolution proceedings. The court accepted jurisdiction on September 14, 1964. Thereafter, without application to or authorization by the court, A-C took the following independent action:

(1) Parts inventory: After the commencement of the dissolution proceedings A-C repossessed the parts inventory of Trinity. At the time of the repossession, Trinity owed approximately $51,000 for those parts and had an equity of $14,506.06. A-C disposed of the parts and used the equity of $14,506.06 to offset the debt owing it by Trinity.

(2) New equipment inventory repossessed by A-C: A-C also repossessed the new equipment inventory held by Trinity after dissolution proceedings were instituted. This equipment, which had been sold to Trinity by A-C, under conditional sales contracts, had an aggregate contract price of $92,053. A-C was able to sell this equipment for $71,925. A-C retained the proceeds from this sale.

(3) Payments received by A-C from Trinity: During the period of court supervision Trinity sold from its used equipment inventory various pieces of equipment against which A-C claimed enforceable conditional sales contracts. The $15,200 realized from these sales was turned over to A-C. In addition, the proceeds in the amount of $2,496 from certain leased equipment were paid directly to A-C. Thus, A-C received a total of $17,696 from Trinity as proceeds from the distribution by Trinity of used machinery inventory during the period of court supervision. A-C in return cancelled a portion of the indebtedness then due it from Trinity.

(4) Auction proceeds: In May of 1965, during the period of admin-

istration, the balance of the equipment inventory of Trinity was sold at public auction. From this sale proceeds amounting to $33,987.77 were realized. Thereafter A-C claimed it was a secured creditor and entitled to priority as to the $28,200.38 of the auction proceeds. This claim was based upon conditional sales contracts covering the auctioned machinery.

The court, after the hearing on Trinity's "Petition for Approval of Preliminary Accounting" issued an order as follows: (1) It denied A-C any rights under its conditional sales contract to the proceeds from the sale of used equipment in the amount of $28,200.38. (2) It ordered, among other things, that A-C return to Trinity the following money: (a) $14,506.06. The amount of the parts repossessed by A-C under the dealer's agreement. (b) $17,696. The amount of the payments A-C received and applied to the used equipment account. (c) $71,925. The amount of the proceeds from the sale of the new equipment repossessed by A-C under its conditional sales contracts.

The trial court found that neither A-C nor Trinity attempted to comply, and they did not in fact comply, with the California Inventory Lien Law in effect at the time of the transactions (Civ. Code, §§ 3030-3043), or with the Uniform Trust Receipts Act in effect at the time of the transactions (Civ. Code, §§ 3012-3016),[1] nor did they provide for a pledge of said inventory in the nature of a field warehousing arrangement. There were no filings or recordings or other form of notice to the public or to the creditors of Trinity of said transactions between Trinity and A-C.

A-C contends that a conditional sales contract is valid against creditors without recordation. CIT concedes that at the time of the present transactions, the conditional sale of equipment, which did not constitute inventory, was generally enforceable by the conditional vendor against the world without filing, recordation or other formal public notice. However, it is CIT's contention that inventory cannot be financed by the use of a conditional sales contract so, as to give the conditional vendor a security interest enforceable against the vendee's creditors in the absence of some type of formal public notice.

Inventory financing in California was based on the Uniform Trust Receipts Law (former Civ. Code, §§ 3012-3016.16) enacted in 1935 and the California Inventory Lien Law (former Civ. Code, §§ 3030-3043) enacted in 1957. Cal. Commercial Law: III (Cont. Ed. Bar 1966) § 8.1.) Field Warehousing of inventory was also permitted. (*McCaffey Canning Co.* v. *Bank of America*, 109 Cal.App. 415 [294 P. 45].)

---

[1]The transactions in question occurred prior to the effective date of the Commercial Code in California and are therefore governed by pre-Commercial Code law.

■ The underlying feature of the permissible types of inventory financing, both under the Commercial Code and under the pre-code law, is and was public notice to the creditors of the merchant. This notice was given either by filing, as in the case of trust receipts and inventory liens, or by actual or constructive possession in the secured property, as in the case of field warehousing. ■ The use of an unrecorded conditional sales contract to create a security interest valid against the vendee's creditors is inconsistent with the California statutory scheme. The practical effect of such a device is the creation of a secret lien upon the vendee's inventory.

The cases relied upon by A-C for the proposition that the conditional sale of inventory to a merchant is valid and enforceable as against general creditors of the merchant do not support its argument. *General Motors Acceptance Corp.* v. *Gilbert,* 196 Cal.App.2d 732 [17 Cal.Rptr. 35], *Chico Tractor, Inc.* v. *Coyle,* 215 Cal.App.2d 483 [30 Cal.Rptr. 196], and *County of San Diego* v. *Davis,* 1 Cal.2d 145 [33 P.2d 827], did not involve the conditional sale of inventory to a merchant and a subsequent controversy between the conditional vendor and the general creditors of the merchant. In *Crestline Mobile Homes Mfg. Co.* v. *Pacific Finance Corp.,* 54 Cal.2d 773 [8 Cal.Rptr. 448, 356 P.2d 192], the question of the general enforceability of a conditional sale of inventory to a dealer was not put in issue because it was conceded that there was a valid conditional sale of the trailer in question to the dealer. (*Id.* at p. 777.) In *Crestline* the dispute was between the conditional vendor of a trailer to a dealer in trailers and a subsequent holder of a trust receipt on the same trailer. The conditional vendor did not prevail because the court found it was estopped to assert its title against the holder of a trust receipt. In *Grover* v. *Tindall,* 242 Cal. App.2d 427, 434 [51 Cal.Rptr. 617], the creditor competing with the conditional vendor conceded the point, "that a valid conditional sales contract can be created covering the stock-in-trade of a merchant when such stock-in-trade is purchased in bulk from a seller who retains title to the specific items therein as security." Thus, the court did not have to decide the validity of a conditional sale of inventory to a merchant.

A-C contends that the board of directors of Trinity had the power to dispose of all or any part of the assets of the corporation upon such terms and conditions and for such considerations as such board deemed reasonable and expedient pursuant to subdivisions (g) and (h) of Corporations Code section 4801. However, A-C does not cite any portion of the record to support its claim that the directors authorized A-C's repossession of the new equipment inventory. For this reason, and because the problem is answered later in this opinion, it is not necessary to discuss the relationship of Corporations Code sections 4801 and 4607 at this time.

■ Therefore, the trial court was correct in ruling that A-C was not a

secured creditor as to the new equipment inventory because it failed to comply with the laws relating to inventory financing, and since there is no evidence to indicate that the directors of Trinity authorized A-C's repossession of the new equipment inventory, the trial court was correct in holding that A-C must return the $71,925 which represents the proceeds from disposition of the new machinery inventory.

A-C contends that it is meaningless to refer to the machinery as inventory because Trinity did not carry it as inventory on its books, but carried it as a purchased machine. Although the form of the transaction appears to be merely the sale of personal property under a conditional sales contract, the substance of the transactions in question is the financing of Trinity's inventory as a dealer in A-C's products.

C. Is CIT entitled to invoke Civil Code section 3440?

The trial court ruled that the transactions between A-C and Trinity, with respect to the used machinery inventory of Trinity, constituted fraudulent conveyances as against the creditors of Trinity and as such were void within the meaning of Civil Code section 3440. This ruling applied to the $17,696 which was paid by Trinity to A-C after the distribution by Trinity of used machinery inventory.

As indicated above, when Trinity received used equipment as a trade-in Trinity would give a bill of sale to A-C. A-C would then credit Trinity on the new equipment sold and then sell the traded-in equipment to Trinity under a conditional sales contract by which A-C would retain title. Trinity retained possession throughout the transaction.

A-C's contention is that CIT is not entitled to invoke Civil Code section 3440 because CIT is a secured creditor who was not looking to the general assets of Trinity for repayment of the money advanced but was looking specifically at the equipment subject to the conditional sales contract. A-C's contention is without merit.

Civil Code section 3440 provides, in essence, that a transfer of personal property made by a person having possession and not accompanied by an immediate delivery followed by an actual change of possession is conclusively presumed fraudulent and void as against the transferor's creditors. The code section does not make any distinction between totally unsecured creditors and those creditors who have realized upon their security and are seeking to recover any deficiency which may exist.

As indicated above, when Trinity sold equipment it would then sell the customer's contracts to CIT with recourse. CIT's contract with Trinity gave CIT the right to repossess the equipment if the customer de-

faulted, sell the equipment and charge Trinity with any deficiency. CIT's claim results from a deficiency of $77,538.52 incurred in repossessing and selling equipment after the customers defaulted upon their contracts.

In view of the original contract between CIT and Trinity, it is apparent that CIT never did intend to rely solely upon its security for payment of the sums advanced to Trinity. Rather, CIT intended to hold Trinity liable for any deficiency. Therefore, even though CIT was a secured creditor as to part of the debt, it was a general creditor as to the deficiency. Further, Corporations Code section 4608 gives secured creditors the right to prove the whole debt in order to realize any deficiency. If secured creditors can prove their whole debt in order to realize any deficiency, they certainly should be considered as coming within the class of creditors capable of invoking the provisions of Civil Code section 3440 in order to set aside fraudulent transfers.

Therefore, it is concluded that CIT was a proper party to invoke the provisions of Civil Code section 3440. Consequently, since there is no claim that the transactions relating to the used equipment were not in fact fraudulent transfers within the meaning of the code section, the ruling of the trial court that A-C must return the $17,696 it received from Trinity and applied to the used equipment account is affirmed.

D. Is A-C entitled to set off Trinity's indebtedness against the equity Trinity has in the parts inventory in the amount of $14,506.06?

After the commencement of the dissolution proceedings A-C repossessed the parts inventory of Trinity. Trinity had an equity of $14,506.06 in those parts. A-C disposed of the parts and used the equity to offset the debt owing it by Trinity.[2] The trial court held that A-C did not have a right of equitable setoff with respect to its obligations to Trinity and Trinity's obligations to it.

It is apparent that if Trinity had not been in the process of winding up under the supervision of the court at the time A-C repossessed the parts inventory A-C would have had the right to an equitable setoff. (*Harrison v. Adams,* 20 Cal.2d 646 [128 P.2d 9].)

It is A-C's contention that the powers of the directors as set forth in Corporations Code section 4801, giving them the power to settle and compromise claims, are not inhibited by the solvency or insolvency of the corporation, and since the directors do have the power to compromise and

---

[2]CIT conceded that there was a valid and perfected field warehousing arrangement relative to those parts, and therefore A-C was secured therein to the extent of about $51,000, which was the amount owing upon them at the time of the repossession.

settle claims, it is clear that some creditors may be paid a greater percentage of their claim. A-C further contends that in view of this power, which the directors have been expressly given in the Corporations Code, it is clear that the purpose of the provisions relating to voluntary winding up is not to guarantee each and every creditor his ratable portion of the corporation's assets.

This raises the question of what is the effect of section 4607 of the Corporations Code giving the court authority to "make orders and adjudge *as to any and all matters* concerning the winding up of the affairs of the corporation" in relation to section 4801 of the Corporations Code. (Italics added.) The corporation voluntarily brought the court into the dissolution to supervise the winding up. If, as A-C maintains, the directors' power under section 4801 of the Corporations Code is controlling, the court's power under section 4607 is merely to rubber-stamp the directors' actions and then issue the corporation an order declaring the corporation duly wound up and dissolved.

Obviously this is not the purpose of court supervision. █ To the extent that sections 4607 and 4801 of the Corporations Code conflict, section 4607 must prevail and the directors must exercise their powers subject to the court's orders as to any and all matters concerning the winding up, including the settling and compromising of claims. █ Thus the trial court was correct in holding that A-C did not have a right of equitable setoff with respect to the $14,506.06.

█ A-C maintains there is no requirement by statute or otherwise for ratable distribution of assets to creditors, and that "[t]he purpose of the formal winding up and dissolution of a corporation is 'to terminate corporate existence and to avoid the risks of liability involved in an informal liquidation and the unauthorized return of capital to the shareholder.' (*Saracco Tank & Welding Co.* v. *Platz* (1944) 65 C.A.2d 306 [150 P.2d 918].)" There is no question but that this is one of the purposes.

However, the court stated an additional purpose in *In re Mayellen Apartments, Inc., supra,* 134 Cal.App.2d 298, a case cited by A-C. "The purpose of this limitation of remedies [§ 4616, Corp. Code] is to preserve the assets for the payment of all the creditors ratably rather than to permit one creditor to seize the assets and obtain an unfair preference, . . ."

█ Thus it is clear that among the purposes of court-supervised dissolution is a ratable distribution of assets, and that is what the court was protecting here.

## II

### *The Appeal of Humboldt County*

Humboldt County filed unsecured property tax claims for the assessments levied in the years 1962, 1963, 1964 and 1965, and contends that it is a priority creditor. In the memorandum of decision dated October 3, 1967 the trial court stated in part: "The priority claim of Humboldt County for personal property taxes, to the extent that the claim exceeds $2,320.00, is denied." However, in paragraph 7(c) of its order the court refers to Humboldt's claim as follows: "COUNTY is entitled to and shall be awarded the sum of $1,937.07 from the assets of Trinity, representing a priority claim for personal property taxes and penalties for the year 1965. To the extent that the claim of COUNTY exceeds the sum of $17,211.16, COUNTY's claim is not a priority claim and COUNTY shall share as a general creditor in the assets of Trinity."

The $2,320 figure is the amount of the taxes due for 1962-63 without consideration of penalties. The $1,937.07 figure is the total due for 1965, including penalties. The $17,211.16 figure is the total due for all four years, including penalties. Humboldt County is in doubt as to the exact amount of its priority claim.

With respect to its claims for personal property taxes, Humboldt filed certificates of delinquent personal property taxes pursuant to section 2191.3 et seq. of the Revenue and Taxation Code.

It is Humboldt's contention that the effect of the filing of the certificates was to create a lien with the force, effect and priority of a judgment lien on all personal and real property owned by Trinity.

In 1961 sections 2191.3 and 2191.4 were added to the Revenue and Taxation Code. Section 2191.3 provided (with certain limitations not material here) that when personal property taxes become delinquent the county may file with the county recorder a certificate specifying the amount of tax, interest and penalties due (along with other information). Section 2191.4 provided: *"From the time of filing the certificate* for record pursuant to Section 2191.3, the amount required to be paid together with the interest and penalty constitutes a lien upon all personal property in the county owned by the taxpayer or acquired by him before the lien expires. . . ." (Italics added.)

Section 2192, setting the time at which the tax lien attaches, stated *"Except as otherwise specifically provided,* all tax liens attach annually as of noon on the first Monday in March. . . ." (Italics added.)

Reading these sections together it seems clear that the specific provision

of section 2191.4 providing that "From the time of the filing of the certificate . . . the amount . . . constitutes a lien" governs the time the lien attaches in this case.

■ Section 2191.4 provides "The lien has the force, effect, and priority of a judgment lien . . ." and there is no question but that any lien in effect at the time of the commencement of the dissolution proceedings has priority over the unsecured creditors. That, however, raises the question of the status of the liens based on the certificates that were filed after the proceeding commenced. If the dissolution proceeding does not prevent the filing of the certificates then they would create valid liens which would have priority over the claims of the unsecured creditors.

The point is raised that the purpose of the dissolution proceeding is to preserve the assets for ratable payment rather than permit unfair preferences to certain creditors. Appellant CIT maintains that the rights of the creditors are fixed as of the time the dissolution proceedings commence, citing 16 Fletcher, Cyclopedia Corporations (1967)'517. Unpaid taxes not a lien when the proceedings commenced are generally not a priority. (16A Fletcher Cyc. Corporations, 518.) The appellant claims to allow the county a preference on taxes after proceedings commence would be contrary to the purposes of the proceeding. However, preferences have been given to the costs of administration, to certain types of taxes, and in some jurisdictions even rent incurred after commencement of the proceedings. (15A Fletcher, Cyc. Corporations, 269.) It is interesting to note that these preferences all relate to services performed for the benefit of the creditors after the commencement of the proceedings and thus are not contrary to the purposes of the proceedings.

In California the voluntary dissolution procedure is provided for by statute. (Corp. Code, § 4607 et seq.) No code section prohibits the filing of the certificate or the attachment of the tax lien after commencement of dissolution proceedings. Corporations Code section 4616 specifically grants jurisdiction to the court to stay the "prosecution of any suit, proceeding or action against the corporation. . . ." Whether the court could have stayed the perfecting of the tax liens in this case is immaterial. It is sufficient that the tax liens were not stayed and did become effective. Thus they now have the force, effect and priority of judgment liens in the amount required to be paid, together with interest and penalties (Rev. & Tax Code, § 2191.4) in the sum of $17,211.16, which claim has priority over the unsecured creditors.

The further point is raised that taxes are not an ordinary debt and therefore are paramount to all other demands, and that this status is independent

of the tax lien certificates. However, as the priority of Humboldt's claim for taxes in this case is set by statute, we need not consider this point.

Humboldt further contends that the taxes for the years 1963-64, together with 1964-65 and 1965-66 were for periods during the course of the winding up proceedings and thus are entitled to priority as administrative expenses. This contention is immaterial for as previously stated, Humboldt's claim for taxes, for these years, is entitled to a priority by statute. Furthermore, personal property taxes would not constitute an administrative expense.

In the case of *Estate of Morris,* 37 Cal.App.2d 155, 157 [99 P.2d 294], which involved the estate of a decedent and the state sales tax, the court stated: "We are of the opinion the retail sales taxes which were found to be due from the estate are not to be classified merely as ordinary expenses of administration."

In *Estate of Chesney,* 1 Cal.App. 30, 33 [81 P. 679], regarding the nature of a collateral inheritance tax, the court stated: "Such tax is not one of the expenses of administration. . . ." The sales tax and inheritance tax are excise taxes as distinguished from a property tax, but this distinction does not appear to be of any importance for the purposes of this case. Also those cases related to the estates of decedents rather than the dissolution of a corporation, but again that distinction does not appear to be material here. ■ Personal property taxes are not expenses that are peculiar to the dissolution of a corporation. They do not grow out of the dissolution as do receivers, administrators and court costs, and exist regardless of whether or not there is a dissolution. Therefore it cannot be said that personal property taxes are an administrative expense.

## III

### The Appeal of CIT Corporation

CIT appeals from that part of the order denying the requested attorney's fees. CIT contends that it should be granted attorney's fees and expenses incurred in presenting and prosecuting its objections to A-C's claim and Humboldt's claim because the result of CIT's efforts was to substantially increase the fund for all unsecured creditors of Trinity.

■ "The general rule in this state is that attorneys' fees are not recoverable by the successful party in either an action at law or in equity except in certain special instances where such fees are made recoverable by express statutory provision. [Citations]" (*Bank of America* v. *West End etc. Co.,* 37 Cal.App.2d 685, 696 [100 P.2d 318]; *Fletcher* v. *A. J. Industries, Inc.,* 266 Cal.App.2d 313, 319 [72 Cal.Rptr. 146]; Code Civ. Proc., § 1021.) ■ CIT seeks to bring itself within an exception to

the general rule which permits the recovery of attorneys' fees in certain actions in equity where the parties prosecuting the action recover, protect, preserve or increase a fund for the benefit of themselves and others and in which actions the recovery is permitted out of such fund. (E.g., *Gabrielson* v. *City of Long Beach,* 56 Cal.2d 224, 229 [14 Cal.Rptr. 651, 363 P.2d 883]; *Estate of Stauffer,* 53 Cal.2d 124, 131 [346 P.2d 748]; *Estate of Reade,* 31 Cal.2d 669 [191 P.2d 745]; *Solorza* v. *Park Water Co.,* 94 Cal. App.2d 818, 821-822 [211 P.2d 891]; the cases are reviewed in *Fletcher* v. *A. J. Industries, supra,* 266 Cal.App.2d 313, 323.)

However, the allowance of attorneys' fees in such circumstances rests largely in the discretion of the trial court and an appellate court should not reverse the denial of fees unless it clearly appears that the trial court abused its discretion (*Bank of America* v. *West End etc. Co., supra,* 37 Cal.App.2d at p. 697.)

Upon the facts of this case, it does not appear that the trial court clearly abused its discretion in denying CIT's claim for attorney fees. CIT was the primary beneficiary of their own actions in objecting to A-C's claim because CIT was the only other creditor with a substantial claim against Trinity. A-C's claim was in excess of $100,000. Humboldt's claim was for approximately $17,000. CIT's claim was for $77,538.52. With the exception of the claim of Crocker-Citizens National Bank, all other claims appear to have been for around $1,000. Therefore, because CIT was the primary beneficiary of its efforts in opposing A-C's claims, CIT should bear its own attorneys' fees.

The order is modified to provide that Humboldt County is allowed a priority on its claim for taxes in the sum of $17,211.16, and in all other respects the order is affirmed. Each party to bear its own costs on appeal.

Draper, P. J., and Brown (H. C.), J., concurred.

The petitions for a rehearing were denied February 11, 1970, and the opinion was modified to read as printed above.