[Civ. No. 56037. Second Dist., Div. Five. Dec. 11, 1979.]

Estate of CLARENCE F. OTT, Deceased.
IRWIN M. FULOP et al., Petitioners and Appellants, v.
J. DAVID GRISSOM, as Successor Trustee, etc., et al., Petitioners and
Respondents.

COUNSEL

Fulop, Rolston, Burns & McKittrick and Alan M. Mund for Petitioners and Appellants.

Jones & Burriss and Leo J. Faulstich for Petitioners and Respondents.

Opinion

**ASHBY, J.**—Appellants Irwin Fulop and Esther Handmaker appeal from that portion of an order settling the first account current of the trustee of the estate of Clarence F. Ott, deceased, which denies appellants' petition for compensation of attorneys.

Appellant Fulop is an attorney licensed to practice law in California. Appellant Esther Handmaker is the widow of Herman Handmaker, who was an attorney licensed to practice law in Kentucky. It is agreed she has succeeded to his interest in the attorney compensation agreement disputed in this case. Respondents Charles Manteuffel and David Manteuffel are grandchildren of the decedent, Clarence F. Ott. Their mother, Ruby Florence Ott Manteuffel (Ruby), was one of decedent's three daughters.

Decedent's will and codicil thereto were offered for probate in Los Angeles in January 1953. The will left $500 each to Ruby and another of decedent's daughters, Edith Ott Meixner (Edith). The will left substantially the balance of the estate to decedent's widow, Lucy Ott, for her life, with the remainder to decedent's third daughter, Mary Blanche Ott Hawkins, and to her then minor children, Elizabeth Hawkins and Charlotte Hawkins. The will contained nothing for Ruby's then minor children, respondents Charles and David Manteuffel.

Ruby and Edith, then residing in Kentucky, hired Attorney Herman Handmaker to contest the will.[1] Ruby's written agreement with Attorney Handmaker provided that she employed him "to represent me in asserting and protecting my interest or interests in the estate of my father, Clarence F. Ott, deceased, and to take such steps as shall be necessary to procure for me a child's interest in my father's estate. [¶] . . . . It is agreed that I will pay you for your services, to be rendered in any litigation or compromise of any claim asserted, a fee equal to 25% of the amount recovered in litigation or compromise. It is further agreed that should it become necessary to engage California counsel to be associated with you in this matter, that the above-mentioned fee arrangement shall not only cover your services, but also the services of such associate counsel in California. In the event that nothing is realized by me, in excess of the $500.00 bequest hereinbefore mentioned, through your efforts or through the efforts of associate counsel engaged

---

[1]Neither Edith nor her son, Clarence Charles Meixner, are involved in this appeal.

in this connection, then I shall be in no way obligated to you. . . ."
Edith executed a similar agreement.

In February 1953 Attorney Handmaker associated Attorney Fulop to represent Edith and Ruby. Handmaker and Fulop agreed to split the fee 50-50. An opposition to the probate of the will was filed. Mary Hawkins was not interested in defending the will, and a settlement of the will contest was quickly reached by March 1953. The settlement agreement was executed by all necessary parties. No guardian or guardian ad litem was appointed to represent Charles Manteuffel and David Manteuffel. On March 31, 1953, the superior court approved the settlement.

The settlement provided in part that upon the death of the life estate beneficiary (the deceased's widow, Lucy) the annual income from a one-fifth portion of the estate shall be paid to Ruby or her assigns, during her lifetime, and upon her death, so much of said net annual income as she shall not have assigned during her lifetime from said one-fifth portion shall be paid to her children living at the time of the death of Clarence, during their lives, and then at the death of each such child his issue shall take that portion of the fund from which the parent had theretofore received the income. A similar provision was made toward Edith and her child.

Lucy Ott, Clarence's widow, died in 1964, thus entitling Ruby and Edith to begin receiving the income from two one-fifth shares as provided by the settlement agreement. To implement her agreement for attorney's fees with Attorney Handmaker, Ruby executed an assignment to Handmaker and to Fulop of "12½ percentum of each [i.e., a total of 25 percent] of all income coming to me under agreement for settlement of the estate of my father. . . .[¶]. . .Said 12½ percentum payments shall cover all amounts accruing to me from my 1/5 interest in the income of said estate so long as I shall live. The remaining 75 percentum is to be paid to me or as I shall from time to time direct." Ruby refused the attorneys' request that she also assign to them 25 percent of the income to be received by Charles and David after her death. She also refused to request Charles and David to execute such assignments.[2]

<hr>

[2]On the other hand, Edith executed a 25 percent assignment to the attorneys of not only the income distributable to her but also the income distributable to her child. Her then adult son, Clarence Charles Meixner, assigned 25 percent of the income payable to him so long as he shall live.

Ruby died on February 24, 1976. Therefore her children, respondents Charles and David Manteuffel, became entitled to income pursuant to the settlement. The attorneys claimed to be entitled to 25 percent of the income payable to Charles Manteuffel and David Manteuffel. The trustee petitioned the court for instructions, and appellants petitioned the court to direct the trustee to pay to appellants 25 percent of the income payable to Charles and David Manteuffel.

The trial court found that appellants were not entitled to any further compensation, and that the assignment of a 25 percent share of Ruby's income terminated with her death. This appeal followed.

### Discussion

Appellants suggest various theories why they should be allowed additional attorney's fees out of the income now payable to respondents David and Charles Manteuffel. For purposes of discussion we divide the arguments into theories based upon Ruby's contract and theories exclusive of the contract.

### Contract

Contrary to appellants' argument, it is clear that Ruby's written contingent fee contract with Attorney Handmaker was to secure his services to represent her solely, not also to represent her two sons. It states: "[T]his communication will evidence my employment of you as *my* attorney to represent *me* in asserting and protecting *my* interest or interests in the estate of my father, Clarence F. Ott, deceased, and to take such steps as shall be necessary to procure *for me a child's interest in my father's estate.* [¶]...[¶] It is agreed that I will pay you for your services, to be rendered in any litigation or compromise of any claim asserted, a fee equal to 25% of the amount recovered in litigation or compromise....In the event that nothing is realized *by me*, ...through your efforts...then I shall be in no way obligated to you...." (Italics added.)

Furthermore, there is nothing in the contract itself or evidence of circumstances surrounding the execution of the contract to indicate that the phrase "25% of the amount recovered in litigation or compromise" means anything other than the amount recovered by Ruby personally. (Cf. *Mahoney* v. *Sharff,* 191 Cal.App.2d 191, 199 [12 Cal.Rptr. 515].)

This amount, of course, is the income she received for her life, and appellants have already received 25 percent of that, in accordance with the contract.

Appellants seem to assume that Ruby could have obtained for herself a one-fifth share of the corpus, and argue that their compensation should not be reduced because Ruby decided to "take" less for herself (a life income) and "give" the remainder interests to her children and grandchildren. But there is no support in the record for appellants' assumption that Ruby herself would have received more if the settlement had not taken the particular form that it did. For all we can tell from the record, the other parties to the will contest may have been unwilling to give Ruby anything more than she actually received, income for her life from a one-fifth portion of the estate.

■  Appellants also contend that respondents were third party beneficiaries of the contract between Ruby and Attorney Handmaker. This was not proved by appellants. Nothing in the contract itself or surrounding circumstances indicates that Ruby intended to benefit respondents by it.

■  Appellants next contend that under the language of the settlement agreement, when Ruby assigned 25 percent of her income to appellants she effectively also assigned 25 percent of respondents' income to appellants. Appellants cite the provision that "upon [Ruby's] death, so much of said net annual income as she shall not have assigned during her lifetime from said one-fifth (1/5th) portion" shall be paid to Ruby's children during their lives. Assuming for purposes of discussion that this provision gave Ruby the power to assign part or all of the income which would go to her children after her death, the record is clear that she did not exercise such power. When approached by appellants she expressly refused to assign respondents' interests or request respondents to do so. Her assignment to appellants in 1965 was limited to "12-½ percentum each of all income *coming to me*...." (Italics added.)

### THEORIES EXCLUSIVE OF CONTRACT

■  Appellants argue that even if respondents have no contractual duty to pay attorney's fees to appellants, nevertheless appellants are equitably entitled to an award of reasonable attorney's fees from the income now going to respondents. Appellants' main theory is that even

though they represented only Ruby in the will contest, the practical effect of their efforts was to confer a substantial benefit on respondents, who otherwise would have taken nothing under the will. Appellants cite the principle that where an attorney has rendered services to make available a "common fund," even though appearing for only one claimant, equity may impose upon the entire fund an award of reasonable attorney's fees for the benefit conferred upon all the members of the class.[3]

None of the California cases cited by appellant applies the common fund theory in the context of a will contest. The closest California case we have found is *Estate of Korthe*, 9 Cal.App.3d 572 [88 Cal.Rptr. 465]. In that case the decedent executed a will in July 1963 leaving her estate to 32 named beneficiaries. In December 1963 the decedent executed a new will revoking all earlier wills and leaving the preponderance of the estate to a couple named Barrett. An attorney named Rose represented some of the original beneficiaries contesting the December will. Other attorneys represented other of the original beneficiaries. Attorney Rose did the lion's share of the work in the will contest, and a favorable settlement was reached under which the December will was withdrawn from probate. The trial court awarded Attorney Rose $20,000 in attorney's fees out of the assets of the entire estate, based on the common fund theory. The Court of Appeal reversed. The court declined to express a view on whether the common fund theory would apply to a will contest situation where some beneficiaries of the contest had sat on their hands while the attorney for other beneficiaries litigated it. (*Id.*, at pp. 575, 577.) But the court did hold the common fund theory was inapplicable in the circumstances of that case, because virtually all the other beneficiaries hired their own attorneys, who appeared in the proceedings on their behalf.

In the absence of California authority squarely supporting recovery by appellants in this situation, appellants rely upon a South Carolina case, *Petition of Crum, supra,* (1941) 196 S.C. 528 [14 S.E.2d 21]. In

---

[3]Appellants cite *Trustees* v. *Greenough*, 105 U.S. 527 [26 L.Ed. 1157]; *Central Railroad* v. *Pettus*, 113 U.S. 116 [28 L.Ed. 915, 5 S.Ct. 387]; *Sprague* v. *Ticonic Bank*, 307 U.S. 161 [83 L.Ed. 1184, 59 S.Ct. 777]; *Winslow* v. *Harold G. Ferguson Corp.*, 25 Cal.2d 274, 284-285 [153 P.2d 714]; *Quinn* v. *State of California*, 15 Cal.3d 162, 167 [124 Cal.Rptr. 1, 539 P.2d 761]; *Glendale City Employees' Assn., Inc.* v. *City of Glendale*, 15 Cal.3d 328, 341 fn. 19 [124 Cal.Rptr. 513, 540 P.2d 609]; *Kaplan* v. *Industrial Indem. Co.*, 79 Cal.App.3d 700, 712 [145 Cal.Rptr. 219]; *Fletcher* v. *A.J. Industries, Inc.*, 266 Cal.App.2d 313, 322-323 [72 Cal.Rptr. 146]; *Coalition for L.A. County Planning etc. Interest* v. *Board of Supervisors*, 76 Cal.App.3d 241, 248 [142 Cal.Rptr. 766]; and *Petition of Crum* (1941) 196 S.C. 528 [14 S.E.2d 21].

that case the decedent's will contained, among others, three devises to A, his heirs and assigns; to B, her heirs and assigns; and to C, his heirs and assigns. A, B, and C were known to be dead by the testator at the time of execution of his will. The executors instituted an action to determine whether the devises had lapsed, with the result that the property involved would pass to certain residuary legatees. Attorney Crum, representing the heirs of B, appeared in the litigation and actively and successfully contended that the specific devises did not lapse. There was no appearance by A and C. The result of Crum's efforts was that the heirs of A, B, and C took their distributive shares under the will. The court held that even though Attorney Crum did not represent the heirs of A and C, he was equitably entitled to an award of reasonable attorney's fees from the common fund going to the heirs of A, B, and C.

However, we find the circumstances in the instant case are not sufficiently parallel to *Crum* to compel an award of attorney's fees to appellants here. ■ Compensation of an attorney from a common fund is an equitable doctrine and its application depends upon all of the circumstances of the case. (See *Estate of Stauffer*, 53 Cal.2d 124, 132 [346 P.2d 748].) Whether to grant or deny such an award depends largely on the discretion of the trial court whose decision should not be reversed unless that discretion was abused. (*In re Trinity Tractor Co.*, 3 Cal.App.3d 428, 445 [83 Cal.Rptr. 783].)

■ Although respondents obtained some interest in a one-fifth portion of the estate at the time of the 1953 settlement, they actually received not one nickel at that time. Under the terms of the settlement agreement, their interest in the fund was both remote and contingent. If respondents predeceased Lucy or Ruby, they would get nothing. There was also a specific provision in the agreement which would have terminated respondents' rights completely in case of certain events in the line of the Mary Hawkins family.[4]

---

[4]Paragraph 18(5)(b) of the agreement provided: "(b) The rights of Ruby Florence Ott Manteuffel, her assigns, any child or children of hers and any issue of such child or children to receive income or principal hereunder shall terminate in any and all events, and notwithstanding any other term of provision hereof, if, upon the death of the last surviving of the following persons, to-wit: Lucy A. Ott, Mary Blanche Ott Hawkins, Elizabeth Hawkins and Charlotte Hawkins, there be no issue then surviving of either of said Elizabeth or the said Charlotte, and in such event, the principal of the said one-fifth portion of the estate referred to in this sub-paragraph (5) shall be paid in equal parts to Champ Shepherd Vance and Lucy Jane Vance; and in the event of the death of either, to their issue *per stirpes*." (Italics in original.)

Even if neither of these events occurred so as to terminate respondents' rights entirely, as of 1953 their right to receive income from the fund was remote. It would come into existence only after the death of Lucy and Ruby. Appellants cite no case in which the benefit allegedly conferred upon another member of the class by the attorney's services was so remote.[5]

It is not that appellants are "guilty" of "laches." The simple fact is that respondents' interest in the 1953 settlement was remote, and that is why this petition for compensation was filed more than 24 years after the settlement of the will contest. Without any connotation of laches, the necessary delay in bringing this litigation is an equitable consideration which should be taken into account in determining whether any valid claim under the common fund theory attached in the first place.[6]

Appellants have not suffered a loss unjustly enriching respondents at appellants' expense. Appellants have been amply compensated by their own client, Ruby.[7] What appellants are seeking is extra compensation. (See Dawson, *Lawyers and Involuntary Clients: Attorney Fees from Funds* (1974) 87 Harv.L.Rev. 1597, 1604, 1652-1653.)

Under all the circumstances, the trial court did not abuse its discretion in denying such additional compensation to appellants.

■ Finally, appellants contend that although respondents were minors at the time of the will contest, legal services are "necessaries of life" for which appellants are entitled to compensation now that respondents are no longer minors. (Citing *In re Ricky H.,* 2 Cal.3d 513, 521 [86 Cal.Rptr. 76, 468 P.2d 204]; *Leonard* v. *Alexander,* 50 Cal.App.2d 385, 387 [122 P.2d 984]; see also Civ. Code, § 36, subd. (a)(1).) But in

---

[5] A few cases have extended the common fund theory to situations where there is not strictly speaking a common fund of money but where "substantial benefits" have been conferred. (See *Fletcher* v. *A.J. Industries, Inc., supra,* 266 Cal.App.2d 313, 323; *Coalition for L.A. County Planning etc. Interest* v. *Board of Supervisors, supra,* 76 Cal.App.3d 241, 247-248; *Serrano* v. *Priest,* 20 Cal.3d 25, 38-42 [141 Cal.Rptr. 315, 569 P.2d 1303].)

[6] If appellants' theory were accepted it might also imply they could file another claim years from now when respondents Charles and David Manteuffel die and the next generation becomes entitled to distribution of the corpus.

[7] During Ruby's lifetime, the two attorneys *each* received $9,727 from Ruby's income. They were each receiving the same level of compensation from Edith. Thus they received a total of over $38,900 for very little effort in pursuing a will contest which was settled within a month after it was filed.

the cases cited by appellants, the services were rendered expressly for the benefit of the minor. In this case, however, the minors were not parties to the will contest, no guardian ad litem was appointed to represent them, and, as we have held, Ruby's contract with appellants was not entered for the benefit of the minors.

The order appealed from is affirmed.

Kaus, P. J., and Hastings, J., concurred.