[S.F. No. 23863. Dec. 6, 1979.]

CONSUMERS LOBBY AGAINST MONOPOLIES et al.,
Petitioners, v.
PUBLIC UTILITIES COMMISSION, Respondent;
PACIFIC TELEPHONE AND TELEGRAPH COMPANY,
Real Party in Interest.

[S.F. No. 23868. Dec. 6, 1979.]

TOWARD UTILITY RATE NORMALIZATION, Petitioner, v.
PUBLIC UTILITIES COMMISSION, Respondent;
PACIFIC TELEPHONE AND TELEGRAPH COMPANY,
Real Party in Interest.

894

896

**COUNSEL**

David L. Wilner, in pro. per., Ann Murphy and Glen L. Moss for Petitioners.

Janice E. Kerr, Hector Anninos and Anne K. Mester for Respondent.

C. H. McCrea as Amicus Curiae on behalf of Respondent.

Robert V. R. Dalenberg, Margaret deB. Brown, Stanley J. Moore and Christopher Lee Rasmussen for Real Party in Interest.

OPINION

**MOSK, J.**—The primary issue in these two consolidated proceedings is whether the Public Utilities Commission (commission) has authority to award attorney fees and costs to public interest participants in its proceedings.

Consumers Lobby Against Monopolies (CLAM) v. Public Utilities Commission (S.F. 23863) presents two questions: first, does the commission possess the power to award attorney fees and costs in quasi-judicial reparation proceedings; and second, may a nonattorney be awarded fees and costs when he serves in a representative capacity in such proceedings. Toward Utility Rate Normalization (TURN) v. Public Utilities Commission (S.F. 23868) raises the issue whether the commission has authority to award attorney fees and costs in quasi-legislative rate-making proceedings.

The commission held in both cases that it lacked the power to award such fees and costs under any statute or equitable theory.[1] We conclude that the commission has jurisdiction to award attorney fees and costs pursuant to the equitable "common fund" doctrine in quasi-judicial reparation proceedings, but not in quasi-legislative rate-making proceedings. We further conclude that in the former proceedings nonattorneys may be awarded fees and costs for their services in a representative capacity.

*S.F. 23863*

David L. Wilner, a nonattorney representing CLAM,[2] investigated the alleged failure of Pacific Telephone and Telegraph Company (Pacific) to collect required tariff charges for the removal and replacement of certain equipment on the premises of commercial customers. He asked the commission staff to take action against Pacific; the staff declined to do so, explaining that he is "free to develop the record and seek appropriate remedies for [Pacific's] alleged wrongdoing," but that "the staff simply lacks the manpower to investigate. . . ."

---

[1]CLAM: *Pacific Telephone & Telegraph Co.* (1978) 83 Cal.P.U.C. 484 (Dec. No. 88533); TURN: *Pacific Telephone & Telegraph Co.* (1978) 83 Cal.P.U.C. 471 (Dec. No. 88532).

[2]Indeed, Wilner *is* CLAM. It has no general membership.

On behalf of CLAM, Wilner then filed a complaint with the commission alleging that Pacific's failure to collect the tariff charges shifted the burden of disconnection costs, amounting to several million dollars, from the equipment users to the general ratepayers. The allegations were never tested in a formal hearing, however, because Pacific negotiated a settlement of the controversy. The settlement required Pacific to pay $400,000 from its earned surplus account, and to use the funds for a "public benefit" to be approved by the commission.

Wilner now seeks to recover costs and representative fees for the reasonable value of his efforts, relying on the equitable common fund, substantial benefit and private attorney general theories.

## S.F. 23868

On February 13, 1975, Pacific filed a general rate application with the commission asking, inter alia, for the right to impose on its customers the procedure entitled "single message rate timing" (SMRT), a usage-sensitive technique whereby local calls are timed and charged by periodic intervals (e.g., five minutes). Thus began long and complex rate proceedings entailing numerous public hearings throughout the state, at which the commission took testimony prepared by its staff, Pacific, TURN, and several other interested parties. The hearings resulted in the issuance of several commission decisions, the filing of a number of petitions for writ of review in this court, and a decision by us concerning SMRT and "60-unit measured rate service." (*Toward Utility Rate Normalization* v. *Public Utilities Com.* (1978) 22 Cal.3d 529 [149 Cal.Rptr. 692, 585 P.2d 491].) At issue in the present case is TURN's right to an award of attorney fees and costs for certain of its efforts relating to SMRT and "30-unit measured rate service" (lifeline).

TURN has assumed an active and substantial role in the lifeline proceedings since their inception. It claims to be wholly or primarily responsible for prompting the commission to confer three pecuniary and nonpecuniary benefits on the ratepayers.

First, during the course of the rate hearings TURN was the only party to question the constitutionality of Pacific's "wiretapping/monitoring" of certain customer telephone conversations. After considering the matter, the commission issued two decisions acknowledging the legitimacy of TURN's complaints and the constitutional infirmities

of Pacific's practices. (Dec. No. 86594, 80 Cal.P.U.C. 621; Dec. No. 88232, 83 Cal.P.U.C. 149.)

Second, TURN significantly contributed to other commission decisions eliminating SMRT and related regrade charges on lifeline service. (Dec. No. 86594, 80 Cal.P.U.C. 621; Dec. No. 87584, 82 Cal.P.U.C. 162.) As a result, Pacific was ordered to remit to lifeline customers $1,085,526.06 in regrade charges and interest collected by Pacific between the effective dates of the original elimination decision and the order reinstating the decision.

Third, TURN was the only party to formally challenge the commission's unlawful modification of its original decision eliminating SMRT. The commission modified the decision in a closed executive session held after the effective date therof. Largely as a result of TURN's efforts, the commission later recognized the illegality of its action and ruled the modification order void. (Dec. No. 87584, *supra,* 82 Cal.P.U.C. 162.)

TURN seeks attorney fees and costs under several theories. First, it argues that certain constitutional provisions empower the commission to include "public participation costs" in setting rates. Second, TURN contends the commission is a "court" within the meaning of Code of Civil Procedure section 1021.5, and hence may award attorney fees pursuant to that section. Finally, TURN, like CLAM, claims the commission has the power to award attorney fees under traditional equitable doctrines.

I

At the outset we address a contention that is often presented to us in response to a petition for writ of review, but nevertheless misapplies the authority on which it relies and ignores the realities of our rulings on such petitions. Both the commission and Pacific assert that we have previously decided the issue now before us—i.e., the commission's authority to award attorney fees and costs to public interest participants in its proceedings—and imply that we should follow those decisions under the doctrine of stare decisis. The decisions in question, however, are not embodied in published opinions of this court, but rather in minute orders in which we denied without opinion petitions for writs of review on two occasions several years ago. (*Citizens to Save Fallbrook's Environment v. Public Utilities Com.* (July 31, 1974) S.F.

23067; *Toward Utility Rate Normalization v. Public Utilities Com.* (Oct. 17, 1976) S.F. 23395.) In support of their contention the commission and Pacific then quote the following language of *People v. Western Air Lines, Inc.* (1954) 42 Cal.2d 621, 630-631 [268 P.2d 723]: "It is established . . . that the denial by this court of a petition for review of an order of the commission is a decision on the merits both as to the law and the facts presented in the review proceedings. [Citation.] This is so even though the order of this court is without opinion."

The reliance is misplaced: *Western Air Lines* is not a stare decisis case but a res judicata case, and hence is governed by very different considerations. *Western Air Lines* arose because the commission decided in a proceeding before it that it had jurisdiction over the defendant's intrastate air route, and fixed the rates to be collected for such service; the defendant petitioned this court for writ of review; we denied the petition without opinion, and the United States Supreme Court dismissed the appeal for want of a federal question. The commission then filed a superior court action in the name of the People to recover statutory penalties from the defendant for its prior collection of unauthorized rates. (Pub. Util. Code, §§ 2104, 2107.) The action was dismissed on demurrer, and we reversed the judgment on the commission's appeal.

Our opinion began by addressing the commission's contention that "the prior decision of the commission followed by the order of this court denying a writ of review and the dismissal of the defendant's appeal by the Supreme Court of the United States has resulted in res judicata as to certain issues involved in the present action," i.e., the commission's jurisdiction to regulate the defendant's intrastate fares. (42 Cal.2d at p. 629.) We recognized that the commission is empowered to make determinations of a judicial nature, and reasoned (at p. 630) that "where those determinations have been appropriately and unsuccessfully challenged, as here, by direct attack and have run the gamut of approval by the highest courts, state and federal, they should have the conclusive effect of res judicata as to the issues involved where they are again brought into question in subsequent proceedings between the same parties." Because the questions relating to the commission's jurisdiction had been resolved in the prior proceeding and the parties in each were essentially the same, we held that the earlier determination was conclusive and "That conclusiveness arises by operation of law." (*Id.* at pp. 632-633.)

■ Seen thus in context, the language now relied on by the commission and Pacific—i.e., that our denial of a petition for writ of review is "a decision on the merits both as to the law and the facts presented in the review proceedings"—was an integral part of our res judicata analysis. The sole means provided by law for judicial review of a commission decision is a petition to this court for writ of review (Pub. Util. Code, § 1756), which thereby serves in effect the office of an appeal. If our ruling on such a petition were not a final "decision on the merits both as to the law and the facts presented," the parties would be denied their right to such review. Because it must therefore be deemed a decision on the merits, our denial of such a petition raises the bar of res judicata against relitigation of the same cause of action between the same parties or their privies. ■ ■■■ This was the rule long before *Western Air Lines* (*Napa Valley Elec. Co. v. R. R. Comm.* (1920) 251 U.S. 366, 371-373 [64 L.Ed. 310, 313, 40 S.Ct. 174]), and it is still the rule today (see, e.g., *Pacific Tele. & Tel. Co. v. P. U. C. of State of Cal.* (9th Cir. 1979) 600 F.2d 1309)[3]

The commission and Pacific do not urge that either of the prior cases they rely on bar the present litigation on the ground of res judicata; nor could they properly do so, for the causes of action here asserted—i.e., the particular claims of CLAM and TURN for attorney fees and costs in their respective proceedings before the commission—are not the same as those asserted in the prior cases. ■ One of the litigants now before us (TURN) was, however, a party to one of the prior decisions (S.F. 23395); as to such a party the prior decision may, in appropriate

---

[3]This reasoning distinguishes the cases involving the prerogative writs such as prohibition and mandate. Because the law does provide other means of judicial review in such cases, appellate courts have discretion to summarily deny petitions for those writs on policy grounds unrelated to their procedural or substantive merits. It follows that an order denying such a petition without opinion is not res judicata. (See, e.g., *People v. Medina* (1972) 6 Cal.3d 484, 488-492 [99 Cal.Rptr. 630, 492 P.2d 686] [denial of petn. for writ of prohibition to review order refusing to suppress evidence]; *Hagan v. Superior Court* (1962) 57 Cal.2d 767, 770 [22 Cal.Rptr. 206, 371 P.2d 982] [denial of petn. for writ of mandate to review discovery order]; *Funeral Dir. Assn. v. Bd. of Funeral Dirs.* (1943) 22 Cal.2d 104 [136 P.2d 785] [denial of petn. for writ of mandate filed in first instance in Supreme Court]; see also *State Bd. of Equalization v. Superior Ct.* (1942) 20 Cal.2d 467, 470-471 [127 P.2d 4].) An exception has been recognized "when the sole possible ground of denial was on the merits or it affirmatively appears that the denial was intended to be on the merits." (*People v. Medina, supra,* at p. 491, fn. 6, of 6 Cal.3d.) And in any case in which the court issues an alternative writ and renders a written decision granting or denying relief, that decision has ordinary res judicata effect. (See, e.g., *Overstreet v. County of Butte* (1962) 57 Cal.2d 504, 506 [20 Cal.Rptr. 631, 370 P.2d 335] [prohibition]; *Hollywood Circle, Inc. v. Dept. of Alcoholic Beverage Control* (1961) 55 Cal.2d 728, 733 [13 Cal.Rptr. 104, 361 P.2d 712] [mandate].)

circumstances, have the limited res judicata effect known as collateral estoppel. (See generally *Clark* v. *Lesher* (1956) 46 Cal.2d 874, 880-881 [299 P.2d 865], and cases cited.) It could therefore be contended that TURN is estopped to relitigate the issue of the commission's jurisdiction to award attorney fees and costs to the extent that such issue was actually decided in the earlier proceeding. But when the issue is a question of law rather than of fact, the prior determination is not conclusive either if injustice would result or if the public interest requires that relitigation not be foreclosed. (*City of Los Angeles* v. *City of San Fernando* (1975) 14 Cal.3d 199, 230 [123 Cal.Rptr. 1, 537 P.2d 1250]; *Louis Stores, Inc.* v. *Department of Alcoholic Beverage Control* (1962) 57 Cal.2d 749, 757-758 [22 Cal.Rptr. 14, 371 P.2d 758].) Both considerations are present in this case. If we were to decide that the commission has jurisdiction to award attorney fees and costs to public interest participants situated similarly to TURN, it would be unjust to deny the possibility of such compensation to TURN solely by reason of the doctrine of collateral estoppel. And because the sole *raison d'etre* of TURN and similar litigants is to represent the public interest, that same interest will evidently be promoted by a correct resolution of this significant question of law.

■ For different reasons we also conclude the prior cases invoked by the commission and Pacific should not be given stare decisis effect. The doctrine of stare decisis applies only to judicial precedents, i.e., to the ratio decidendi or actual ground of decision of a case cited as authority. (*Hart* v. *Burnett* (1860) 15 Cal. 530, 598-599.) It follows, of course, that a case is not authority for a point that was not actually decided by the court. (*Ibid.*; accord, *In re Tartar* (1959) 52 Cal.2d 250, 258 [339 P.2d 553], and cases cited.) The ratio decidendi of an appellate decision is ordinarily discovered by examining the opinion of the court. But we deal here, by definition, with cases in which this court rendered its decision without opinion, summarily denying petitions for writs of review. By relying on such cases as authority for points of law, the commission and Pacific imply that our ratio decidendi in each instance was necessarily a ruling on the substantive grounds presented by the writ and answer. The code itself demonstrates this is not so.

First, we are required to deny the entire petition on procedural grounds if certain prerequisites to our jurisdiction are not met. This will occur, for example, if prior to filing in this court the petitioner failed to apply to the commission for a rehearing (Pub. Util. Code, § 1731; compare Gov. Code, § 11523 [contrary rule under Administrative

Procedure Act]), or if the petitioner so applied but the application was denied by the commission on the ground that it was not timely filed (Pub. Util. Code, § 1731), or if the petitioner failed to apply to this court for a writ within the time specified by law (*Id.*, § 1756). In none of these instances, obviously, is our decision based on substantive grounds.

Secondly, many if not most petitions for writ of review attack the action of the commission on multiple grounds. Yet the code prohibits the petitioner from relying on any ground that he did not set forth in his petition for rehearing before the commission. (*Id.*, § 1732.) If he persists in presenting such an issue to us in disregard of the statute, we are required to reject it for that reason alone. It follows that as to any such issue our denial of the petition is a decision on procedural grounds alone.

Moreover, general principles of law governing judicial review of administrative proceedings may also require us to deny an entire petition for writ—or reject a particular ground thereof—without reaching its substantive issues. Thus if the petitioner presents a question that he could have litigated before the commission but did not, we are barred from addressing it by the doctrine of exhaustion of administrative remedies. (See generally *Abelleira* v. *District Court of Appeal* (1941) 17 Cal.2d 280, 291-296 [109 P.2d 942, 132 A.L.R. 715].)

The petition may come too late in another sense: when the issue raised by the petitioner is rendered moot by supervening events, the court will ordinarily deny the application for that reason. (See, e.g., *Cline* v. *Industrial Acc. Com.* (1931) 116 Cal.App. 439, 440 [2 P.2d 840].) It is true that in exceptional instances the court may nevertheless choose to address the issue if sufficient private rights (e.g., *Hall* v. *Scudder* (1946) 74 Cal.App.2d 433, 438 [168 P.2d 990]) or public interests (e.g., *Ballard* v. *Anderson* (1971) 4 Cal.3d 873, 876-877 [95 Cal.Rptr. 1, 484 P.2d 1345, 42 A.L.R.3d 1392]; *DiGiorgio Fruit Corp.* v. *Dept. of Employment* (1961) 56 Cal.2d 54, 58 [13 Cal.Rptr. 663, 362 P.2d 487]) are at stake. It cannot do so, however, without taking the case; thus if it denies the petition without opinion when the issue is shown to be moot, it must be presumed to have acted on that ground.

On the other hand, the petitioner may bring his case before us too soon. Although the code appears to permit the filing of a petition for rehearing and hence a petition for review after "any order or decision" of

the commission (Pub. Util. Code, §§ 1731, 1756), the commission frequently resists issuance of the writ on the ground the application is premature. It argues that the order or decision under attack is merely an interlocutory ruling—a step in a larger, ongoing proceeding not yet finally resolved by the commission—and therefore is not ripe for judicial review. While the legal principle is settled (see, e.g., *Gumilla* v. *Industrial Acc. Com.* (1921) 187 Cal. 638, 639-640 [203 P. 397]), the question of when a commission action is sufficiently final for purposes of judicial review is often perplexing to the court. It is clear, however, that each time we deny all or part of a petition for lack of ripeness, we do not adjudicate its substantive issues.

Finally, although standing to apply for judicial review in this court is accorded by the code to all parties to the proceedings before the commission and all person "pecuniarily interested" in the public utility in question (Pub. Util. Code, §§ 1731, 1756), we will deny the petition without reaching substantive issues when it appears that for any reason the applicant was not in fact aggrieved by the action of the commission. This result follows, for example, if the alleged harm is merely speculative (e.g., *E. Clemens Horst Co.* v. *Railroad Com.* (1917) 175 Cal. 660 [166 P. 804]), if the petition is in effect seeking declaratory relief (e.g., *C. A. Hooper & Co.* v. *Railroad Com.* (1917) 175 Cal. 811 [165 P. 689]), or if the petitioner is not a member of the class to which the principle contended for would apply.[4]

---

[4]This was the case, for example, in one of the prior denials of writs of review relied on herein by the commission and Pacific as stare decisis. (*Citizens to Save Fallbrook's Environment* v. *Public Utilities Com.* (July 31, 1974) S.F. 23067.) There the petitioner, a local public-interest group, sought to prevent commission approval of a utility's proposal to build an electric power transmission line across a scenic area. Initially the petitioner prevailed, and the commission issued a decision ordering the utility to adopt an alternate route proposed by the petitioner. The petitioner filed a motion for attorney fees. Thereafter, however, the commission reopened the case (Pub. Util. Code, § 1708), took additional evidence, and issued a new decision in which it approved the route originally proposed by the utility. The commission also denied the petitioner's request for attorney fees.

After denial of rehearing the petitioner applied to this court for a writ of review, attacking both the lawfulness of the second decision and the denial of attorney fees. On the latter point the petitioner contended it should be compensated for its efforts because it assertedly vindicated the public policy of preserving the environment and thus obtained a substantial benefit for the citizenry at large. The commission responded by defending its second decision and denying it had authority to award attorney fees. In ruling on the petition, however, we did not need to reach the latter issue: because we concluded that the second commission decision—approving the route proposed by the utility—was lawful, the petitioner ipso facto was not a prevailing party in the case. It had therefore conferred no benefit whatever on the public, and its request for attorney fees could be rejected without reaching the issue of the commission's authority to make such an award.

In short, although a summary denial by this court of a petition for writ of review is "a decision on the merits" for res judicata purposes (*Western Air Lines*), it is not stare decisis. As we have seen, the merits of the decision may well be procedural rather than substantive; yet because there is no opinion, its ratio decidendi does not appear on its face. It would therefore be sheer speculation for litigants to rely on such decisions as precedents. In addition, such reliance may well prove a trap for the unwary: members of the public who have potentially meritorious petitions for review to present to this court may be dissuaded from doing so by the mere fact that we declined to take an earlier case allegedly raising the same question.

For the foregoing reasons, the prior cases relied on herein by the commission and Pacific are neither binding nor persuasive on the issue now before us.

## II

The commission is a state agency of constitutional origin with far-reaching duties, functions and powers. (Cal. Const., art. XII, §§ 1-6.) The Constitution confers broad authority on the commission to regulate utilities, including the power to fix rates, establish rules, hold various types of hearings, award reparation, and establish its own procedures. (*Id.*, §§ 2, 4, 6.) The commission's powers, however, are not restricted to those expressly mentioned in the Constitution: "The Legislature has plenary power, unlimited by the other provisions of this constitution but consistent with this article, to confer additional authority and jurisdiction upon the commission...." (Cal. Const., art. XII, § 5.)

Pursuant to this grant of power the Legislature enacted Public Utilities Code section 701, conferring on the commission expansive authority to "*do all things,* whether specifically designated in [the Public Utilities Act] *or addition thereto,* which are necessary and convenient" in the supervision and regulation of every public utility in California. (Italics added.) The commission's authority has been liberally construed. (See, e.g., *People* v. *Superior Court* (1965) 62 Cal.2d 515 [42 Cal.Rptr. 849, 399 P.2d 385]; *People* v. *Western Air Lines, Inc.* (1954) *supra,* 42 Cal.2d 621; *Sale* v. *Railroad Commission* (1940) 15 Cal.2d 612 [104 P.2d 38]; *Kern County Land Co.* v. *Railroad Com.* (1934) 2 Cal.2d 29 [38 P.2d 401, 39 P.2d 402].) Additional powers and jurisdiction that the commission exercises, however, "must be cognate and germane to

the regulation of public utilities. . . ." (*Morel* v. *Railroad Commission* (1938) 11 Cal.2d 488, 492 [81 P.2d 144], and cases cited; accord, *Southern Cal. Gas Co.* v. *Public Utilities Com.* (1979) 24 Cal.3d 653, 656 [156 Cal.Rptr. 733, 596 P.2d 1149].)

Several results follow from the Legislature's open-ended grant of authority to the commission. First, the grant negates the contention of Pacific and the commission that the latter lacks power to award attorney fees because there is no express statutory authorization therefor. Similarly, little persuasivie value is left to their argument that recent legislation specifically authorizing *courts* to award attorney fees (Code Civ. Proc., § 1021.5; Pub. Util. Code, § 453, subd. (b)) evinces an intent, by negative implication, that the commission be denied the power to award attorney fees under section 701. ■ The proper focus of our inquiry, therefore, is under what circumstances jurisdiction to award attorney fees is cognate and germane to, and consistent with, regulation of public utilities and established legal principles.

■ The general rule is that a party is entitled to an award of attorney fees if there is specific authorization therefor by statute or private agreement. (Code Civ. Proc., § 1021.) There are, however, three well-established equitable exceptions to the general rule, known as the common fund, substantial benefit, and private attorney general theories. (See generally *Serrano* v. *Priest* (1977) 20 Cal.3d 25 [141 Cal.Rptr. 315, 569 P.2d 1303].) Since these are doctrines created, developed, and historically invoked by courts of equity, we must determine whether the commission possesses sufficient judicial power to award attorney fees and costs pursuant to any of such theories.

"[W]hile it is true that the commission is not a judicial tribunal in a strict sense, it does not follow that it does not possess well established and well understood judicial power." (*People* v. *Western Air Lines, Inc., supra,* 42 Cal.2d 621, 632; accord, *Sale* v. *Railroad Commission, supra,* 15 Cal.2d 612, 617.)[5] Of course, the commission's judicial powers are not coextensive with those exercised by courts. There is, nevertheless, a significant coincidence of powers between the two, including those that are equitable in nature.

---

[5]There are two principal reasons why the commission is not a judicial tribunal in a strict sense. Technically, it is not constitutionally established as a judicial department. (Cal. Const., art. VI.) Moreover, it is not unusual for the commission to act as "inform-

The commission often exercises equitable jurisdiction as an incident to its express duties and authority. For example, the commission may issue injunctions in aid of jurisdiction specifically conferred upon it. (*Kern County Land Co. v. Railroad Com., supra,* 2 Cal.2d 29, 36; *Motor Transit Co. v. Railroad Commission* (1922) 189 Cal. 573, 582 [209 P. 586].) It may direct that a trust fund be created to conserve potential refunds during a stay of an order lowering rates. (*People v. Superior Court, supra,* 62 Cal.2d 515, 516.) Its power to reform contracts of public utilities to make them conform to the public interest has been recognized. (*Southern Pac. Co. v. Spring Valley W. Co.* (1916) 173 Cal. 291, 298 [159 P. 865] [dictum].) And the commission itself has relied on equitable precedent in implementing its authority to issue cease and desist orders. (*Eastshore Consolidated Water Co.* (1959) 57 Cal.P.U.C. 231; *Regulated Carriers, Inc. v. Farnham* (1935) 39 C.R.C. 323, 326.)

██ One of the commission's express powers is the authority to order public utilities that charge unlawful rates to make reparation to aggrieved ratepayers pursuant to Public Utilities Code section 734. The predecessor to that statute was section 71 of the Public Utilities Act. (Stats. 1915, ch. 91, § 71, p. 164.) Prior to the adoption of such legislation "there was no forum except the courts" in which a claim for reparation could be adjudicated. (*Southern Pacific Co. v. Railroad Com.* (1924) 194 Cal. 734, 737-738 [231 P.28].) When the commission was established it was vested with jurisdiction to exercise the "judicial function" of awarding reparation under the statute. (*Id.* at p. 738.) Yet if such an action could still be brought in the superior court, undoubtedly the court would have equitable jurisdiction to award attorney fees pursuant to the common fund theory. ██ Under this theory, "'one who expends attorneys' fees in winning a suit which creates a fund from which others derive benefits, may require those passive beneficiaries to bear a fair share of the litigation costs.'" (*Serrano v. Priest, supra,* 20 Cal.3d 25, 35, quoting from *Quinn v. State of California* (1975) 15 Cal.3d 162, 167 [124 Cal.Rptr. 1, 539 P.2d 761].) ██ There are persuasive reasons for holding that the commission likewise has equitable power to award attorney fees from a common fund in such circumstances.

---

er, prosecutor, jury and judge in matters coming before it." (*People v. Western Air Lines, Inc., supra,* 42 Cal.2d at p. 631.) Thus, while a court may be described as a "passive" forum for adjusting disputes, the commission may assume a much more "active" role. (*Sale v. Railroad Commission, supra,* 15 Cal.2d at p. 617.)

The commission's quasi-judicial proceedings closely resemble court proceedings. Procedures largely parallel to those of courts are employed; there are identifiable parties plaintiff and defendant; the commission acts as trier of fact, applies rules of law to those facts, and renders a decision adjudicating vested interests in which there are clear prevailing and losing parties. Moreover, successful reparation actions before the commission may result in the creation of a common fund that is available for satisfying an award of attorney fees. In view of these similarities, we conclude that the commission possesses equitable power to award attorney fees under the common fund doctrine in quasi-judicial reparation actions.[6]

Several policy arguments against recognizing such jurisdicition are advanced by Pacific and the commission, but none is persuasive. Both contend the commission staff adequately represents the public, so that awarding attorney fees will require the public to pay for multiple representation. This argument has a hollow ring in the CLAM case, inasmuch as the staff refused CLAM's request for commission action. Moreover, the staff is subject to institutional pressures that can create conflicts of interest; and it is circumscribed by significant statutory limitations, such as lack of standing to seek either rehearing (Pub. Util. Code, § 1731) or judicial review (*Id.*, § 1756) of commission decisions.

Nor are we persuaded that permitting attorney fees in quasi-judicial reparation cases will cause a plethora of administrative problems by opening the "floodgate of public participation." Administrative problems are not novel in the commission's adjudicatory proceedings, and we are confident that it can solve these problems effectively under its rule-making power. ■ We reiterate that the common fund doctrine is tailored so that attorney fees are awarded in only the most meritorious cases. And under traditional equitable principles, the decision to award attorney fees will, of course, lie in the sound discretion of the commission, reviewable only if a clear abuse of that discretion is shown. (See *In re Trinity Tractor Co.* (1970) 3 Cal.App.3d 428, 445 [83 Cal.Rptr. 783]; *Grant v. Hartman Ranch Co.* (1961) 193 Cal.App.2d

---

[6]We recognize this is not a typical reparation case on its facts: the complaint is not that the utility overcharged but that it undercharged, and the ultimate beneficiary of the money to be paid by the utility is not the individual complainant but the public as a whole. For present purposes, however, these are distinctions without a difference. An undercharge may be no less "unreasonable...or discriminatory" within the meaning of section 734 than an overcharge; and if the beneficiary is the public at large, it is all the more appropriate that the public be made to bear the necessary litigation expenses by taxing the common fund.

497, 502 [14 Cal.Rptr. 531]; *Bank of America* v. *West End etc. Co.* (1940) 37 Cal.App.2d 685, 697 [100 P.2d 318].)

## III

Considerations that militate in favor of recognizing equitable jurisdiction to award attorney fees in reparation cases, however, do not apply to ratemaking matters. The commission's duties, functions, and powers differ markedly in the two settings. "There is a distinction between the power to fix rates and the power to award reparation. The former is a legislative function, the latter is judicial its nature." (*Southern Pacific Co.* v. *Railroad Com., supra,* 194 Cal. 734, 739.) The fixing of a rate and the reducing of that rate are prospective in application and quasi-legislative in character. (*Ibid.*) In contrast, reparation looks to the past with a view toward remedying primarily private injury, and is quasi-judicial in nature. (*Id.* at pp. 739-740.)

There are several salient differences between quasi-legislative and quasi-judicial proceedings. "In adopting rules governing service and in fixing rates, [the] commission exercises legislative functions delegated to it and does not, in so doing, adjudicate vested interests or render quasi-judicial decisions...." (*Wood* v. *Public Utilities Commission* (1971) 4 Cal.3d 288, 292 [93 Cal.Rptr. 455, 481 P.2d 823].) The rules of practice and procedure promulgated by the commission are liberal in allowing public participation in ratemaking proceedings. (E.g., Cal. Admin. Code, tit. 20, rule 54.) Hence there may be a number of interveners in such matters, representing a wide variety of public positions. The commission's primary task is to assimilate those views into a composite "public interest," a give-and-take process often producing a result that cannot be deemed a clear-cut victory for any party.

These differences illustrate why certain concepts developed by the courts for use in an adversary system are not easily transplanted outside the adjudicatory context. Isolating the contribution of each of numerous interveners is likely to be impossible, given the complexity of rate-making proceedings. Even requiring the commission to attempt such determinations would further burden its task of administering the cumbersome ratemaking procedure. Because of these marked contrasts between the two proceedings we hold that the commission's equitable jurisdiction to award attorney fees in quasi-judicial reparation actions does not extend to its quasi-legislative ratemaking duties.

The refunds ordered in the TURN case, moreover, were not reparations within the settled meaning of the term. The commission directed Pacific to collect the charges subject to possible refund *after* the effective date of the original elimination decision, pending a determination of the legality of an extension of the effective date. The refunds therefore were *prospective* in nature, ordered in a quasi-legislative proceeding, akin to a reduction in rates. Because they were ordered collected subject to refund, they were not remedial relief for past injuries; as we have noted, a prospective reduction in rates is quasi-legislative in nature, unlike an award of reparation. (See *Southern Pacific Co.* v. *Railroad Com., supra,* 194, Cal. 734, 739-740.)

We conclude that in S.F. 23868 TURN is not entitled to an award of attorney fees and costs under any of the equitable doctrines.

## IV

 TURN advances two additional theories under which the commission assertedly has jurisdiction to award attorney fees in quasi-legislative ratemaking proceedings. First, TURN invokes Code of Civil Procedure section 1021.5.[7] That section, however, only authorizes "a court" to award attorney fees "in any action." By no stretch of definition is the commission a "court" when acting in this context, nor is a ratemaking proceeding an "action" within the meaning of the statute. We must assume, rather, that if the Legislature had intended section 1021.5 to apply to administrative agencies in any of their functions, it would have plainly said so. Because there is no such language in the statute, we conclude that section 1021.5 does not authorize the commission to award attorney fees in ratemaking proceedings.

 TURN's more substantial argument is that Public Utilities Code sections 701 and 728 permit the commission to include "public

---

[7]Section 1021.5 provides: "Upon motion, *a court* may award attorneys' fees to a successful party against one or more opposing parties *in any action* which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or non-pecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any. With respect to actions involving public entities, this section applies to allowances against, but not in favor of, public entities, and no claim shall be required to be filed therefor." (Italics added.)

participation costs" in the expenses charged to ratepayers.[8] TURN contends these sections "provide ample authority for the commission to (1) determine the amount of compensation that is necessary to secure the beneficial participation of public members in ratesetting proceedings; (2) to determine that a rate established without an allowance for public participation costs will not sufficiently protect the interests of the rate payers; (3) to correct the insufficiency by including public participation costs within the operating costs on which the rate is established; and (4) having allowed for such costs, to award them to qualified public participants."

It is true that public interest interveners such as TURN speak for a substantial segment of the population that otherwise may go unheard. As mentioned above, the commission staff cannot fully and adequately represent all facets of the public interest, and in some instances—as in the CLAM matter—it may fail to discern the ratepayers' rights. Public interest interveners therefore fill a gap in the ratemaking process.

The special contributions of groups such as TURN must also be considered. The commission concedes that participation of the general public in ratemaking proceedings "is to be commended, and even encouraged." Effective participation in complex commission hearings, however, requires technical expertise and continuous scrutiny of various proposals and rulings. Groups such as TURN provide that expertise and scrutiny as a counterweight to the views expressed by the utilities.

Notwithstanding TURN's salutary contributions to the lot of the California ratepayer, however, we are not persuaded that sections 701 and 728 require, or even permit, the commission to shift TURN's "public participation costs" to the ratepayers. TURN's theory cuts far too broadly. For the reasons stated in part III, *ante*, the result might well prove an administrative quagmire, and the consequences of such an interpretation would go far beyond the circumstances presented in this case. The decision to include such "public participation costs" in rate-

---

[8]Section 701 provides: "The commission may supervise and regulate every public utility in the State and may do all things, whether specifically designated in [the Public Utilities Act] or in addition thereto, which are necessary and convenient in the exercise of such power and jurisdiction."

Section 728 provides in relevant part: "Whenever the commission, after a hearing, finds that the rates...charged, or collected by any public utility for or in connection with any service,...are insufficient, unlawful, unjust, unreasonable, discriminatory, or preferential, the commission shall determine and fix, by order, the just, reasonable, or sufficient rates...to be thereafter observed and in force."

making proceedings is more appropriately within the province of the Legislature.[9]

Purportedly contrary authority advanced by TURN is not helpful. TURN points to the practice of several federal agencies of establishing systems for compensating public interest interveners for participation in agency proceedings. However, the legality of such programs has not been definitively established; and federal agency practice, of course, is neither binding on nor necessarily persuasive to this court.

In any event, the federal programs are distinguishable from the case at bar. Following *Greene County Planning Bd.* v. *Fed. Power Com'n* (2d Cir. 1976) 559 F.2d. 1227, 1238-1240—which held that the Federal Power Commission lacks statutory authority to award attorney fees and costs to interveners in proceedings before it—the Office of Legal Counsel of the United States Department of Justice apparently took the position that the case does not preclude an agency "'from determining whether its organic statutes and other relevant statutes permit some kind of compensation program to be established'" from its own budget. (43 Fed.Reg. 14050 (Apr. 4, 1978).) Here, by contrast, the commission has determined that its own organic statutes do not authorize it to award "public participation costs" in ratemaking proceedings. Even under the federal authorities, negative determination by the agency disposes of the issue.[10]

---

[9]For example, in a statute enacted after the decisions herein and applicable only to *electric* utility rate-making proceedings (Public Utility Regulatory Policies Act of 1978, 16 U.S.C. § 2601 et seq.), Congress prescribed that any consumer "may intervene and participate as a matter of right" in any such proceeding (§ 2631, (a)); and if that consumer has "substantially contributed to the approval, in whole or in part, of a position advocated by such consumer" promoting the purposes of the act, he may recover attorney fees and costs either from the utility (§ 2632 (a)) or from an alternative source provided by the state regulatory authority (*id.*, subd. (b)).

[10]The Supreme Court of Colorado has also reached a contrary result. (*Mountain States Tel. & Tel. Co.* v. *Public Util. Com.* (1978) 195 Colo. 130 [576 P.2d 544, 546-548].) There are, however, salient differences between *Mountain States* and the instant case. Colorado's commission examined the pertinent authorities and determined it had the power to award attorney fees and costs to public interest interveners as an "operating expense" of the utility in setting the rates; California's commission construed its authorities and concluded it lacked such power. More importantly, the Colorado Constitution expressly delegates all legislative authority in ratemaking matters to the Colorado commission (Colo. Const., art. XXV; *Mountain States Tel. & Tel. Co.* v. *Public Util. Com., supra,* 576 P.2d at p. 547; *Miller Bros., Inc.* v. *Public Utilities Commission* (1974) 185 Colo. 414 [525 P.2d 443, 451]); California's Constitution, however, delegates such legislative authority to the Legislature. (Cal. Const., art. XII,

## V

■ We have thus far concluded that the commission correctly determined it was without authority to award attorney fees and costs in quasi-legislative ratemaking proceedings, but that in quasi-judicial reparation actions it does have discretion to award such fees and costs under the common fund theory. The final issue for determination is whether in the latter proceedings fees and costs may be awarded to a nonattorney appearing in a representative capacity.

Pacific and the commission contend that even if the latter has the authority to award attorney fees, it nevertheless may not award any fees to Wilner because he is not an attorney. In support of this contention they rely on cases from other jurisdictions holding that nonattorneys who appear in propria persona are not entitled to recover attorney fees. (*Hannon* v. *Security Nat. Bank* (9th Cir. 1976) 537 F.2d 327, 328-329; *Bone* v. *Hibernia Bank* (N.D.Cal. 973) 354 F.Supp. 310, 311; *Parquit Corp.* v. *Ross* (1975) 273 Ore.900 [543 P.2d 1070, 1071.) These cases, however, all focus exclusively on the issue of whether a nonattorney may be awarded attorney fees in a *judicial* proceeding. Although their rationale is unstated, it appears that a principal purpose of the rule they adopt is to protect the public by discouraging persons not recognized by the state as professionally competent from acting as legal representatives. (See, e.g., *Picking* v. *Pennsylvania R. Co.* (M.D.Pa. 1951) 11 F.R.D. 71, 73, cited in *Bone, supra,* at p. 311 of 354 F.Supp.)[11] Whatever the merit of this rationale, it is inapplicable to the present case.

Nonattorneys are generally not permitted to participate in judicial proceedings; rather, with a few limited exceptions, a person must be licensed as an attorney before he can appear in court.[12] In Public Utilities Commission proceedings, by contrast, the participants are not

§ 5.) Therefore, the decision to establish a system for compensating public interest organizations for participation in the commission's quasi-legislative proceedings is a prerogative of the Legislature.

[11]*Hannon*, however, was decided on the ground of congressional intent as to an attorney fee provision of the federal Truth in Lending Act; it is therefore inapposite in the present context. To the extent the rule in the other two cases cited by the parties may rest on the notion that a person who represents himself should not recover fees because he has not paid a fee or incurred any liability therefor, see footnote 13, *post.*

[12]Business and Professions Code section 6125 restricts the practice of law to active members of the State Bar. (See also *id.,* §§ 6006, 6117; *Merco Constr. Engineers, Inc.* v. *Municipal Court* (1978) 21 Cal.3d 724 [147 Cal.Rptr. 631, 581 P.2d 636] [holding unconstitutional a statute authorizing representation in propria persona by corporations

required to be licensed attorneys, and it is common for such persons to make appearances on behalf of others. The commission's own rules explicitly acknowledge this practice. (See, e.g., Cal. Admin. Code, tit. 20, rule 4.) Moreover, even a brief perusal of the California Public Utilities Commission Reports demonstrates that appearances by nonattorneys comprise a substantial and important part of the practice before that body. We must infer that the commission believes such persons are competent to participate in its proceedings in a representative capacity. It follows that the cases relied on by the commission provide no justification for precluding nonattorneys who are permitted to appear in its proceedings from recovering reasonable fees for their services.

Pacific and the commission also urge that Wilner should be denied the right to recover fees in this case because he was acting on his own behalf. They rely on decisions of this court and Courts of Appeal holding that an attorney representing himself may not recover the reasonable value of his services because he has neither paid a fee nor incurred any liability to do so. (*City of Long Beach* v. *Sten* (1929) 206 Cal. 473 [274 P. 968]; *Patterson* v. *Donner* (1874) 48 Cal. 369, 380; *Bruno* v. *Bell* (1979) 91 Cal.App.3d 776, 783, 786 [154 Cal.Rptr. 435]; *O'Connell* v. *Zimmerman* (1958) 157 Cal.App.2d 330, 337 [321 P.2d 161]; *City of Los Angeles* v. *Hunt* (1935) 8 Cal.App.2d 401, 403-404 [47 P.2d 1075].) The argument is not persuasive.

Equitable considerations provide compelling grounds for awarding fees to Wilner despite the foregoing general rule. Although Wilner appeared before the commission nominally on his own behalf, in so doing he represented in effect the interests of those ratepayers who ultimately benefited from the settlement he obtained. As discussed at the outset, Wilner succeeded in creating a $400,000 fund to be expended by Pacific for the public benefit. It would be inconsistent with the common fund theory to deny him compensation for his services in these circumstances. The rationale of that theory is that fees should be awarded to

in municipal and justice courts].) One example of an exception to this provision is California Rules of Court rule 983, which permits an out-of-state attorney on written application to appear in a court of this state as counsel *pro hac vice,* provided that an active member of the State Bar is associated as attorney of record. Even this exception, however, is carefully qualified: the applicant must (1) be a member of the bar of a federal court or the highest court of another state or a possession of the United States, and (2) not be a resident of California or "regularly engaged in substantial business, professional, or other activities in the State of California." Further, "Absent special circumstances, repeated appearances...shall be a cause for denial of an application." (*Id.,* subd. (a).) (Compare *Faretta* v. *California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525] [rule in criminal cases].)

the person who creates such a fund because all who will benefit from it should bear equally the burdens of its creation or preservation, and this result is best achieved by taxing the fund itself. (*Serrano* v. *Priest, supra,* 20 Cal.3d 25, 35, fn. 5.) If Wilner were not permitted to recover fees out of the fund for his services, those who benefited from but did not work to create the fund would profit at Wilner's expense.[13]

For the foregoing reasons, we hold the commission does have jurisdiction to award Wilner representative fees and costs for his services in connection with preparing and presenting his case before the commission. The reasonable value of those services, of course, is for the commission to determine.[14]

## Conclusion

As appears from the concurring and dissenting opinions hereto all members of the court concur in Part I of this opinion. Justices Clark, Richardson and Manuel concur in parts III and IV, holding that the commission lacks authority to award attorney fees and costs in quasi-legislative ratemaking proceedings. For the reasons there stated, the decision in S.F. 23868 (TURN) is affirmed.

The Chief Justice and Justices Tobriner and Newman concur in parts II and V, holding that the commission has jurisdiction to award attorney fees and costs under the common fund doctrine in quasi-judicial reparation proceedings, and in those actions may make such awards to nonattorneys who appear before it in a representative capacity. For the reasons there stated, the decision in S.F. 23863 (CLAM) is annulled,

---

[13]Moreover, the logic of past decisions that do not allow an attorney to recover fees when he appears on his own behalf is unclear. Although such an attorney does not pay a fee or incur any *financial* liability therefor to another, his *time spent* in preparing and presenting his case is not somehow rendered less valuable because he is representing himself rather than a third party. Accordingly, it would appear he should be compensated when he represents himself if he would otherwise be entitled to such compensation, absent a showing in a particular case that such an award would place his interests in conflict with those whom he represents.

[14]In addition, Wilner asserts that he and CLAM incurred an obligation to pay attorney fees to two named lawyers, one of whom is now deceased. Neither lawyer appeared before the commission on behalf of CLAM; but if they nevertheless furnished legal services to CLAM in connection with that proceeding, their fees are recoverable pursuant to Part II of this opinion. Whether such services were rendered, and if so, the value thereof, are factual matters that should also be determined by the commission on remand.

and the proceeding is remanded to the commission for a determination of the fees and costs to be awarded to Wilner and CLAM in accordance with the views expressed herein.

**RICHARDSON, J.** Concurring and Dissenting.— ■■ ■■ ■■ I concur with parts I, III and IV of the majority opinion and in its holding that the Public Utilities Commission lacks the authority to award attorney's fees in quasi-legislative ratemaking proceedings. I respectfully dissent, however, from those portions of the opinion (pts. II and V) which hold that in quasi-judicial reparation actions the commission may, in its discretion, award attorney's fees and that similar awards may be made to nonattorneys.

Section 1021 of the Code of Civil Procedure (all further statutory references are to that code unless otherwise cited) provides that: "Except as attorney's fees are *specifically provided for by statute,* the measure and mode of compensation of attorneys and counselors at law is left to the agreement, express or implied, of the parties; but parties to *actions or proceedings* are entitled to costs and disbursements, as hereinafter provided." (Italics added.) I have previously expressed my opinion that, under the express language of section 1021, attorney's fees may not be awarded in *any* action or proceeding in the absence of specific statutory authorization or agreement of the parties. (*Serrano* v. *Priest* (1977) 20 Cal.3d 25, 51 (dis. opn.) [141 Cal.Rptr. 315, 569 P.2d 1303].) The majority once again rejects this view and holds that in addition to the various proceedings specified by statute (e.g., §§ 836, 874.010, 1031, 1268.610; Civ. Code, § 4370), attorney's fees may be awarded in *any* judicial or quasi-judicial proceeding under such equitable principles as the "common fund" theory. The majority, I believe, is in error.

Concurrently with our decision in *Serrano,* and perhaps in response to the United States Supreme Court's decision in *Alyeska Pipeline Co.* v. *Wilderness Society* (1975) 421 U.S. 240 [44 L.Ed.2d 141, 95 S.Ct. 1612] (see *County of Inyo* v. *City of Los Angeles* (1978) 78 Cal.App.3d 82, 89, fn. 2 [144 Cal.Rptr. 71]), the Legislature in 1977 adopted section 1021.5 which in pertinent part provides: "Upon motion, a *court* may award attorneys' fees . . . in any action which has resulted in the enforcement of an important right affecting the public interest [under specified conditions] . . . ." (Italics added.) By adopting section 1021.5, the Legislature clearly, in my view, intended to codify and limit the various equitable doctrines discussed and applied in *Serrano* and to provide

the statutory authorization required by section 1021 for awards of attorney's fees. By limiting such awards under section 1021.5 to "court" proceedings, the Legislature probably intended to preclude the granting of these awards by the Public Utilities Commission because no similar statute was enacted to allow such awards in administrative proceedings. The majority's continued reliance upon the equitable common fund theory is thus contrary to the express intent of the Legislature.

The majority disputes the premise that section 1021.5 was intended to deny the commission the power to award attorney's fees. According to the majority, in view of the broad powers legislatively conferred upon the commission (see Pub. Util. Code, § 701) and liberally construed by the decisions of this court, the commission needs no express statutory authorization to award attorney's fees. Such a view, however, is wholly inconsistent with the express provisions of section 1021.

As noted above, section 1021 requires specific statutory authorization or private agreement before attorney's fees may be awarded in "actions or proceedings." The section thus applies both to judicial and administrative proceedings. If the Legislature had intended to grant administrative bodies the power to award such fees, it could readily have so provided. It has not done so.

As to that portion of the majority opinion which would allow similar awards to be made to nonattorneys, I simply note that, as the commission lacks all statutory authority to award attorney's fees, a fortiori, it may not award similar fees to nonattorneys. Indeed, I am unaware of any authority, statutory or judicial, which would sanction such an award from the public treasury. Given the difficult, technical and complex issues which are routinely raised in commission proceedings, it seems to me inappropriate to adopt any rule which, as a general proposition, would encourage representation by laypersons of the public interest before agencies such as the Public Utilities Commission.

I would affirm both of the commission's decisions under review herein.

Clark, J., and Manuel, J., concurred.

NEWMAN, J., Concurring and Dissenting.— ██ ██ ██ ██ ██ I concur with parts I, II and V of the majority opinion. I dissent

from parts III and IV because I believe that the commission's jurisdiction to award attorney fees extends beyond "quasi-judicial reparation actions." I am not persuaded that attorney-fee awards are inappropriate in rate-making cases.

Interestingly, since 1947 when our Legislature first prescribed overall procedures for adopting and amending regulations, "every regulation...which...[e]stablishes or fixes rates" has been exempted from the California Administrative Procedure Act. (See Gov. Code, §§ 11380, subd. (a) (1) and 11421, subd. (a).)

The Federal Administrative Procedure Act, too, segregates rate-making from other rulemaking. Generally, the type of rate-prescribing rules that are at issue here is by law required to be made on the record after opportunity for agency hearing; and 5 United States Code section 553(c), which governs most federal rulemaking, provides that in those on-the-record cases "sections 556 and 557 of this title apply instead of this subsection." Those two sections (556 and 557) mostly govern formal adjudication, and only in section 556(d) and section 557(b) is there any kind of special adjustment for rate-making and other on-the-record rulemaking.

What explains that deferential approach to rate-making that both the California Legislature and the Congress have articulated? I think it is demonstrable that legislators have been influenced less by the famous dictum in *Prentis* v. *Atlantic Coast Line* (1908) 211 U.S. 210, 226 [53 L.Ed. 150, 158-159, 29 S.Ct. 67] ("establishment of a rate is the making of a rule for the future, and therefore is an act legislative not judicial")[1] than by the holdings of *Morgan* v. *United States* (1936) 298 U.S. 468 [80 L.Ed. 1288, 56 S.Ct. 906] and (1938) 304 U.S. 1 [82 L.Ed. 1129, 58 S.Ct. 773]. In the first of those two *Morgan* cases Hughes, C.J. (at p. 480 [80 L.Ed. at p. 1295]) stated: "A [rate-making] proceeding of this sort requiring the taking and weighing of evidence, determinations of fact based upon the consideration of the evidence, and the making of an order supported by such findings, has a quality resembling that of a judicial proceeding. Hence it is frequently described as a proceeding of a *quasi-judicial* character." In the second

---

[1]*Prentis* is cited in *Southern Pacific Co.* v. *Railroad Com.* (1924) 194 Cal. 734, 738 [231 P.2d 28], which the majority opinion here quotes (*ante*, p. 909). Nothing held in that case is inconsistent with my view here, I believe. Some dicta in *Wood* v. *Public Utilities Commission* (1971) 4 Cal.3d 288, 292-293 [93 Cal.Rptr. 455, 481 P.2d 823], also quoted (*id.*), do appear inconsistent.

(304 U.S. at p. 18 [82 L.Ed. at pp. 1132-1133]), he referred to rate-making as a "contest with the Government in a *quasi-judicial proceeding* aimed at the control of their [the Kansas City Stock Yards marketing agencies'] activities...." Further (pp. 19-20 [82 L.Ed. at p. 1133]), "Congress, in requiring a 'full hearing' had regard to judicial standards,—not in any technical sense but with respect to those fundamental requirements of fairness which are of the essence of due process in *a proceeding of a judicial nature*....[¶] The answer that the proceeding...was not of an adversary character, as it was not upon complaint but was initiated as a general inquiry, is futile. It has regard to the mere form of the proceeding and ignores realities. In all substantial respects, the Government...was prosecuting the proceeding against the owners of the market agencies. *The proceeding had all the essential elements of contested litigation,* with the Government and its counsel on the one side and the appellants and their counsel on the other. It is idle to say that this was not a proceeding in reality against the appellants when the very existence of their agencies was put in jeopardy. Upon the rates for their services the owners depended for their livelihood, and the proceeding attacked them at a vital spot." (All italics added.)

What is the relevance here of those *Morgan* case excerpts? I think they explain why, concerning the award of attorney fees, on-the-record rate-making is comparable to "quasi-judicial reparation."

The majority stress that there may be "a number of interveners" and that there may not be "a clear-cut victory for any party." Those problems also arise, of course, in many adjudications. (Cf. 2 Davis, Administrative Law Treatise (2d ed. 1979) § 7.2 ("Rules and Rulemaking Distinguished from Orders and Adjudication") and § 10.5 ("Classification as Adjudication or Rulemaking Is Not the Key to Proper Procedure").)

What line would I draw? We cannot anticipate all future questions. We could, though, identify the differences between rate-making proceedings that are on the record and those that are not. The observations of Chief Justice Hughes in the *Morgan* cases are a good start because they acknowledge that the role of lawyers in on-the-record rate-making is parallel to the role of lawyers in adjudication.

I think the search is for "trial-type proceedings," as to which Professor Kenneth Davis has given us remarkably perceptive guides. (See his

Administrative Law Treatise (2d ed. 1979) vol. 2, ch. 12 ("Requirement of Opportunity for Trial-Type Hearing").) In trial-type proceedings, attorney fees are appropriate because there the attorneys do perform the kind of adversary tasks that prominently have characterized the lawyer's function.

Bird, C. J., and Tobriner, J., concurred.

Petitioners' application in No. 23868 for a rehearing was denied January 3, 1980. Bird, C. J., and Tobriner, J., were of the opinion that the application should be granted.